Clyde Franklin **CORDREY**, Administrator of the Estate of C. F. Cordrey, Deceased, Appellee,

v.

Louis David **CORDREY** and Mrs. Louis David Cordrey, Appellants.

No. 49811.

Court of Appeals of Oklahoma, Division No. 2.

March 7, 1978.

Released for Publication by Order of Court of Appeals March 30, 1978.

Paul E. Vestal, Tulsa, for appellee.

Gary Brasel, Frasier & Frasier, Tulsa, for appellants.

BRIGHTMIRE, Judge.

"[H]e did not believe in banks." And so when the old man was hospitalized they found his life savings hidden in a box under his bed—53 crisp one hundred dollar bills. Not long after that the patriarch died and a legal struggle for the money began between his estate (and in effect four sons) on the one hand and a fifth son and his wife on the other. The couple lost in the trial court and appeal claiming the court should have found that they were entitled to keep possession of the money because either the deceased gave it to his daughter-in-law shortly before he died, or the couple earned it as a result of personal services rendered.

## I

This action was commenced in July 22, 1975 by decedent C. F. Cordrey's administrator (a son) against another of his sons, Louis Cordrey and his wife, Dortha, to recover the controversial money alleging that the elder Cordrey owned it when he died intestate on May 15, 1975. The administrator said he had demanded the money on behalf of the estate but defendants refused to deliver it to him and had converted it to their own use.

December 8, 1975 defendants filed an amended answer admitting that one of the defendants, Dortha Cordrey, was in possession of $5,200 [1] but that on April 10, 1975 decedent delivered the money to her with the "intention to make a gift" of it. They

---

1. The record indicates that there were initially 53 bills. It is not clear what happened to one of them, but evidently something did because Dortha came into possession of only 52.

further said she accepted the gift and from then on "treated the money as her own." Three months later defendants filed a verified cross-petition seeking recovery of (1) $3,000 for "services rendered" by them to decedent during the two years preceding his death (2) $10,000 which they spent on behalf of decedent and (3) $1,000 for medical bills they paid on behalf of the deceased during the same two-year period. They evidently had filed no claim with the estate for these amounts because none appears in the record and they alleged that no such claim was necessary under the provision of 58 O.S.1971 §§ 331, 339 and 341 in that their "cause of action is purely equitable in nature." Plaintiff never filed an answer to this cross-petition, but apparently the case went to trial and was disposed of as if a general denial had been filed.

After hearing the evidence May 13, 1976 the trial court found deceased had not given the $5,200 to Mrs. Cordrey and that nothing was owing to either defendant for any services rendered to or on behalf of C. F. Cordrey before he died. The court further found "that the defendant[s] should be reimbursed for any verified amounts paid by them for funeral and last illness expenses" should they present a claim to the administrator accompanied by acceptable proof they had paid it.

## II

Defendants present their argument under a single proposition, or conclusion really, that they "are entitled to retain the sum of $5,200 by virtue of having been given said sum by the decedent . . . or in the alternative are entitled to an amount certain for services rendered to decedent."

Defendants mention the gift issue but once saying: "The question of whether a gift was made is a difficult one except for the fact decedent would certainly have a reason to make same. Considering the fact that appellants did what they did for him it could easily be concluded such a gift was made. The question of services rendered," they add, "is not so difficult to answer." And it is to this question the rest of their four-page presentation is devoted.

## III

We agree that it is difficult to come up with a valid reason for disturbing the trial court's finding that the deceased did not give his entire life savings to a daughter-in-law not long before his death under the recorded circumstances. Quite frankly a review of the record produces the impression that the alleged gift did not take place. Circumstantially the likelihood of such a gift seems to run counter to the temperament, inclination and propensity of the deceased and is not strengthened by alternate positions taken by defendants (gift or payment for services) both in the trial court and here.

Biographical data on the senior Cordrey is very incomplete. He was the father of five boys—Dencil (the oldest), Clyde (the administrator), Louis (a defendant), Thomas, and Amos. Apparently he was a widower and in recent years lived alone in a cottage located somewhere between Broken Arrow and Bixby, Oklahoma.

Dortha Cordrey testified that she thought it was in the fall of 1973 "when I first started going and seeing about him." It was about this time deceased "started calling and wanting me to come take him to the store and places." Occasionally when he was not feeling well he would visit and maybe stay all night with Louis and Dortha in their Pryor, Oklahoma home and when he did she would wait on him. During this period of time when Dortha would do something for the aging gent she said he would say, "You are going to be paid well for this." And, added Dortha, "I believed him because I thought he was a man of his word." Consequently she cared for deceased for a period of time in 1973 "with the expectation [she] would be paid."

During the next several months the ailing father was in and out of hospitals at Pryor and Tulsa. Finally on April 8, 1975 Clyde removed his father from a Tulsa hospital and placed him in a Broken Arrow nursing home. The next day Clyde went through his father's home and found in an

old box under the bed subject money in an old billfold wrapped in a rag bound with string and rubber bands. Clyde removed the money and took it home where he "put it in the freezer . . . for safekeeping."

That same day, April 9, Louis and Thomas removed their dad from the nursing home and took him to Pryor. Before leaving Broken Arrow, though, Thomas and Dortha took deceased by Clyde's house and retrieved the frozen asset.

The following day, April 10, according to Dortha, she and her father-in-law were alone in the house and he gave her the $5,200. "[H]e told me that he was giving this to me because I had been good to him, I had took him into my home, I was looking after him. He said that he felt that none of his other kids would and he said that he felt I had earned it."

Dortha said she accepted the money and added, "I left it in a suitcase [belonging to the father-in-law] where I had it because I did not see any point in moving it . . . the first time that I moved it was the next day we took it out of the suitcase, he [her father-in-law] and I did, and then we put it back. . . . And the next time it was removed was the night that Clyde came over and he wanted to count it. I did not want any trouble. So I let him count it."

Louis testified that when he got home from work on April 10, his wife said to him, "He gave me the money that is in the billfold." The 40-year-old mechanic admitted, however, his father never said anything to him about it.

Two days later, on April 12, deceased fell, hurt himself and was taken to the Pryor hospital.

Clyde testified that he talked with Louis on April 16 and was told Louis wanted to put their ailing father "back into the home at Broken Arrow." The subject about the "fifty-two hundred dollars" came up and Louis asked Clyde if he "would take the money and put it in a bank." Clyde declined. "I did not want to take care of it because dad had not been put in the home

as of yet." Louis and his wife therefore agreed to keep and use it to pay for the nursing home care.

Deceased was returned to the nursing home April 20. Ten days later Dortha said she took subject money out of decedent's suitcase.

Deceased apparently became critically ill on May 13 and died in the Osteopathic Hospital two days later. "We paid the funeral expenses out of it," said Dortha referring to the $5,200, "I gave my husband the money and told him I felt that I wanted to do that . . . I would say he probably paid the nursing home and drug bills and everything—I would say around six or seven hundred dollars." This was the only part of it spent other than some $75. Dortha earlier used to buy a dress and a pair of shoes.

Another bit of material testimony was given by Thomas—a witness put on the stand by defendants—who said his dad told him "he would give it [the $5,200] all to Louie and Louie would help me whenever I needed it."

If perhaps it can be said that the foregoing evidence supports defendants' allegation of a gift it does not do so preponderatingly. To the contrary defendants insist the money was transferred to Dortha on April 10 as payment for services rendered by Dortha in fulfillment of an earlier promise. This is at war with the conclusion that the alleged transaction was a gift because of the fundamental fact that a gift inter vivos is the voluntary transfer of property without consideration. *Wood v. Harris*, 201 Okl. 201, 203 P.2d 710 (1949).

■ Not only is defendants' evidence regarding a gift to Dortha equivocal as to whether the alleged transfer was a promised payment or a gift, but the probity of such evidence is further damaged by Thomas' testimony that his dad told him he was going to give the money to Louis. Apparently defendants' inter vivos payment-for-services theory was a belated one surfacing after the issues were formed by the pleadings because it was not mentioned either in

defendants' answer or cross-petition. Under these circumstances we have no basis for condemning as erroneous the trial court's finding that no such inter vivos payment was made to Dortha on April 10, 1975.

## IV

Defendants offered yet a third theory for defeating the administrator's lawsuit in a verified cross-petition in which they seek recovery of $3,000 from the estate under a cause of action—which they say "is purely equitable in nature"—for services rendered to C. F. Cordrey during the two years prior to his death. They also ask to be reimbursed for $11,000 they spent on behalf of deceased during the same two-year period.

The cross-petition offers significant confirmation that the trial court's finding with respect to the inter vivos service agreement was correct by valuing the services both parties say they rendered deceased at $2,200 less than the $5,200 Dortha says she was given for her services alone.

 So far as the merits of the cross-petition itself is concerned it seems clear that it does not allege a viable cause of action because it fails to mention presentation of a claim to the administrator for the amount sought from the estate within the time allowed in the notice to creditors. Such failure precludes enforcement of the claim against the estate. *Miller v. Bradburn's Estate*, 106 Okl. 234, 233 P. 736 (1925). Defendants confirm the presentation failure but insist a presentation was unnecessary because theirs is an "equitable claim" which need not be presented pursuant to the provisions of 58 O.S.1971 § 331. We disagree. The substance of their allegations is that defendants rendered certain services for two years prior to decedent's death and for that they are entitled to $3,000. This is what ordinarily would be considered an action on an agreement implied by law entitling them to a "quantum meruit" recovery for their services. *Mosley v. Mosley*, Okl., 321 P.2d 421 (1958). Such an action is one at law and not equity. The same thing is true of defendants' claim for recovery of funds spent on behalf of deceased. Consequently the cross-petition fails to state a valid cause of action.

For these reasons we hold the trial court's judgment free from reversible error.

NEPTUNE, P. J., and BACON, J., concur.